Lynn and Deyon BOUGHTON, et al., Plaintiffs–Appellants,

v.

COTTER CORPORATION, Defendant–Appellee.

No. 94–1155.

United States Court of Appeals, Tenth Circuit.

Sept. 6, 1995.

824

Louise M. Roselle of Waite, Schneider, Bayless & Chesley, Cincinnati, OH, and James R. Christoph of McCormick & Christoph, Boulder, CO (Stanley Chesley of Waite, Schneider, Bayless & Chesley; Kenneth N. Kripke, Denver, CO; and David Kreutzer, Boulder, CO, with them on the brief) for plaintiffs-appellants.

John Leonard Watson and Edward E. Stevenson of Holme, Roberts & Owen, Denver, CO for defendant-appellee.

SEYMOUR, Chief Judge, HENRY, Circuit Judge, and COOK, Senior District Judge.*

H. DALE COOK, Senior District Judge.

The plaintiffs in this case were over 500 individuals alleging exposures of their persons and property to hazardous emissions of a uranium mill owned by the defendant corporation, Cotter Corporation (Cotter). Most of the plaintiffs demanded medical monitoring on account of radiation exposure but generally the plaintiffs did not allege physical illnesses. The plaintiffs brought an action alleging violations of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (1990) and the Price Anderson Act, 42 U.S.C. § 2210 (1990) as well as state law claims including negligence, trespass and nuisance.

Certification of a class was proposed and denied on three occasions. After a trial to a jury for eight bellwether plaintiffs a verdict was returned in which all eight plaintiffs prevailed on negligence, six prevailed on trespass and three on nuisance. The plaintiffs appeal the denial of class certification, the refusal of the trial judge to allow them to depose an attorney for the defendant, the refusal of the trial judge to admit evidence of the fears of the plaintiffs of contracting disease to show damages and the trial judge's decision to grant summary judgment on the issue of piercing the corporate veil. We affirm.

## I. CLASS CERTIFICATION

Although the plaintiffs concede that there are individual issues relating to the calculation of damages for those who were exposed to the uranium mill emissions they contend that there are common issues related to the liability of the defendants that should be tried as a class action. They argue that issues of whether the defendants behaved in

* Honorable H. Dale Cook, Senior United States District Judge for the Northern District of Oklahoma, sitting by designation.

a wrongful manner and what knowledge they had of the harmful effects of the emissions are common issues. They also argue that the models used for determining the extent of individual exposure and harm resulting from the emissions are common issues because such models will have variables representing individual characteristics. Although the calculation of the damages will be an individual by individual determination, plaintiffs nevertheless contend that the issues of what models to use for that calculation are common issues.

The plaintiffs contend that there are three such models: One to determine air exposure, another to determine water exposure and a third to determine "uptake" or how much of a harmful substance is taken into the body. The defendants argue that the plaintiffs' approach is too simplistic and that many models would be needed.

■ If the lower court did not apply an improper standard the court's decision is reviewed for an abuse of discretion. *Pilots Against Illegal Dues v. Air Line Pilots*, 938 F.2d 1123, 1134 (10th Cir.1991). The plaintiffs conceded in their opening brief that this was the appropriate standard of review. The discretion granted to the trial court on the certification issue leaves the decision as to what method of trial is most efficient primarily to the court that is in the best position to determine the facts of the case, to appreciate the consequences of alternative methods of resolving the issues of the case and that is in the best position to select the most efficient method for their resolution.

In her December 18, 1991 order, the judge below refused to certify a class under FED. R.CIV.P. § 23(b)(3), finding that individual questions predominated over common questions of liability; such individual issues including whether purchasers were aware contamination existed, the extent and nature of injuries, the degree and length of exposure, the prevalence of contamination and proof of ownership to water rights. With regard to plaintiffs' argument that common liability issues could be tried as a class with individual issues of damages determined separately, the judge decided that this was not appropriate because there was not a single course of conduct alleged to have caused the injuries, identical with respect to each plaintiff; the judge said that the plaintiffs alleged that their injuries derived from more than one source and that it could not be shown that the claims of the proposed class members were all based upon one legal or remedial theory.

The plaintiffs argue that the abuse of discretion standard is one that has teeth, citing the case of *Esplin v. Hirschi*, 402 F.2d 94 (10th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969)—the first case we decided on the issue under Rule 23 after the 1966 amendments—where we required certification under Rule 23 notwithstanding the trial judge's decision to the contrary.

Of course, a decision to deny certification may, under certain circumstances, constitute an abuse of discretion. Nevertheless, it is not clear that we were applying the current abuse of discretion standard in deciding *Esplin v. Hirschi*. Our opinion in that case did not acknowledge discretion in the trial judge on the certification question except for discretion on whether to apply the 1966 amendments to pending cases.

In any event, it is not necessary for us to critically examine *Esplin v. Hirschi* at this time because, even assuming that the case applied an abuse of discretion standard and was otherwise correctly decided, we find that the facts of that case are easily distinguished. *Esplin v. Hirschi* was a securities fraud case. The notes of the advisory committee accompanying the 1966 amendments state that predominance of common issues over individual issues would be necessary for the economies of the class action device under Rule 23(b)(3) to be achieved, and specifically stated: "In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action ..." On the contrary, only a few sentences later the advisory committee notes caution that "[a] 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affect-

ing the individuals in different ways." We also note that where the claim is based on a particular financial transaction, such as a purchase of stock, it is more easy to identify similarly situated individuals who made such purchases than to identify individuals who might have been exposed to hazardous substances released into the environment in varying ways and degrees at different times.[1]

*Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D.Colo.1993), cited by the plaintiffs, is not to the contrary because it is a district court decision, certifying a medical monitoring class under Rule 23(b)(2) and a property class under Rule 23(b)(3); the issue on appeal here is not whether the trial court could have certified a class but whether it was an abuse of discretion not to certify. The plaintiffs seek, among other things, the certification of a class for medical monitoring under Rule 23(b)(2). Although it is not necessary for common issues to predominate over individual issues under Rule 23(b)(2), provided that the trial judge does not apply an improper standard the decision whether to certify is still discretionary. *Adamson v. Bowen*, 855 F.2d 668 (10th Cir.1988) (where a decision not to certify was vacated because the trial court incorrectly held that predomination of common issues was a prerequisite to certification under Rule 23(b)(2) and the case was remanded for the trial court to exercise discretion under a correct interpretation of the law).

1. Where a court is faced with a straightforward question to certify or not certify a clearly defined class or subclass the court can keep both of its options open by certifying the class with the idea of later decertifying the class should the evidence show that certification was not warranted. However, where, as here, there are multiple types of claims, more than one form of relief sought and the parties disagree about the number of models necessary to deal with the various ways in which properties may have become contaminated it may not be so simple as to err on the side of certification just to keep the option open because there may be mutually exclusive ways of defining subclasses and any attempt to certify subclasses before it is clear what the common issues are carries with it the potential for making the case less manageable.

2. The lower court found that the plaintiffs failed to show that claims would be satisfied from a

■ The trial judge, in her order filed December 18, 1991, considered and rejected certification under Rules 23(b)(1), (2) and (3).[2] She decided, "[w]hile plaintiffs' claims relating to medical monitoring, if brought by themselves, might constitute a proper basis for certifying this suit under Rule 23(b)(2), certification is not proper here. The relief is predominately money damages ..." The trial judge understood that injunctive relief was requested and that certification of a class under such circumstances was legally permissible under Rule 23(b)(2), but nevertheless decided that it was not appropriate to certify a class under that rule where the relief sought was primarily money damages. Refusal to certify for that reason was not an abuse of the trial court's discretion.

■ Under Rule 23(b)(3) the trial judge held that individual issues predominated over common issues. She noted that the "[p]laintiffs allege that their injuries derive from more than one source, and questions of injuries *and liability* may differ depending upon where individual plaintiffs reside." (emphasis added) Although the wording of the opinion does not state expressly that discretion is being exercised and essentially states that the plaintiffs failed to meet the statutory prerequisites for certification under Rule 23(b)(3) so that certification would be legally improper, it has been held that a trial court's determination that common issues do not predominate is also reviewed under the abuse of discretion standard. "This is so

limited fund under Rule 23(b)(1)(B). In their written and oral arguments related to class certification the plaintiffs did not challenge this finding as clearly erroneous or an abuse of discretion, but merely referenced their arguments below in a footnote citation to their appendix.

The lower court did not address Rule 23(b)(1)(A) which provides that a class action may be maintained if inconsistent adjudications could establish incompatible standards of conduct for the party opposing the class (in this case, the defendant). The defendants, who should be the ones most concerned about any such potential inconsistency do not appeal the decision. In addition, at oral argument on appeal the plaintiffs contended that the defendants would be bound by the adjudications below on common issues, a result that would preclude the possibility of inconsistent adjudications. In taking this position the plaintiffs implicitly waived any argument for certification under Rule 23(b)(1)(A).

because ... it is 'a practical problem, and primarily a factual one with which a district court generally has a greater familiarity and expertise than does a court of appeals.'" *Windham v. American Brands, Inc.,* 565 F.2d 59, 65 (4th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978), citing *Link v. Mercedes–Benz of North America,* 550 F.2d 860, 864 (3d Cir.), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). (*Windham* speaks generally of case manageability, but the opinion at p. 66 makes clear that the specific determination of whether common issues predominate is included within the abuse of discretion standard.)

The plaintiffs contend that the defendants' own experts "could [not] testify as to the impact the actions of the Defendant had on any individual plaintiff. [footnote citation omitted] Rather, each and every defense expert spoke of the harm done to the community as a whole." Aplt.Brief 14. Nevertheless, the transcript of the direct examination of defense expert Adrian Brown contains several pages of testimony regarding the "individual bellwethers in this case." Aplt.App. 2350–2356. In this testimony the witness gave his opinion that certain properties were not affected by materials from the Cotter mill and that other properties were affected in varying degrees.[3]

The plaintiffs cite *Cook v. Rockwell,* 147 F.R.D. 237, 244 (D.Colo.1993) for the proposition that dose reconstruction can rarely be based *solely* on measurements of existing levels of contaminants in the air, soil and bodies of individual plaintiffs. However, the fact remains that individual measurements can be quite relevant evidence in determining the extent of an individual's level of exposure and that such measurements may vary from individual to individual. The testimony that

particular individuals' properties were not exposed to particular kinds of emissions might, on at least some of the claims alleging common law torts, have defeated liability.[4] Whether, on balance, individual issues predominated over common issues and whether the advantages of a class action outweighed the potential problems such as case manageability and jury confusion of multiple issues are determinations that are generally best left to the trial court. In this case the trial court decided that the best method for handling this case would be to select a set of bellwether plaintiffs and have a trial on their claims. We hold that the trial court's decision not to certify under Rule 23(b)(3) was not an abuse of discretion.

## II. DEPOSITION OF DEFENSE COUNSEL

■ The lower court issued a protective order prohibiting the plaintiffs from taking the deposition of Edward McGrath, outside counsel representing the defendants in this matter. The plaintiffs appeal that decision. The decision of a trial judge to enter a protective order under Rule 26(c) is reviewed for abuse of discretion. *Florida v. Kerr–McGee Corp.,* 669 F.2d 620, 623 (10th Cir. 1982).

The plaintiffs argue that Mr. McGrath should have been deposed because of his role as spokesperson for Cotter Corporation before regulatory agencies and the press and because of his involvement in helping Cotter prepare its various license applications and giving "business advice" to Cotter on the location of a new mill on the site of the old one. The plaintiffs in their motion for leave to take McGrath's deposition gave four areas of inquiry for which the deposition was sought:

3. It is appropriate for an appellate court, in affirming a trial court's decision on a class certification motion to take into account evidence that was not before the court below until after it made its certification rulings because under Rule 23(c)(1) an order for class certification may be altered or amended—and is therefore not final—until the decision on the merits. Even if a trial court were to abuse its discretion in denying class certification at an early stage, the error is harmless if, upon a more full development of the record, the trial court would have had discretion

to decertify at a later time for the same reasons that were given earlier for not certifying (or for decertifying) and those reasons were not advanced in bad faith.

4. The plaintiffs' proposed class was defined by the geographic region in which people lived, owned property or worked during a specified period. It was not limited to particular causes of action.

"(1) [T]he decision to construct a new uranium mill in the mid–1970's;

(2) the construction and licensing of the new mill in the 1975–1979 time frame;

(3) Cotter's environmental program during that same period; and

(4) the basis of the statements Mr. McGrath made to the public, the media, and various governmental agencies with regard to the construction, licensing, operation and environmental impact of the new mill."

Aplt.App. 707.

Notwithstanding plaintiffs' claims that McGrath had other roles, the lower court treated McGrath as an attorney for Cotter subject to the protection of *Shelton v. American Motors Corp.,* 805 F.2d 1323 (8th Cir. 1986). The record supported the lower court's treatment of McGrath's status. David P. Marcott, who was executive vice president and general manager of Cotter from February 1956 until February 1980, said, "Mr. McGrath operated solely as an attorney. He made no operating decisions." [5] George Rifakes, the president of Cotter after May of 1974, said, "Mr. McGrath was working as a lawyer, intermediary. He was not authorized to make commitments on behalf of the company without prior approval from management. He was a spokesperson like most lawyers are." [6]

■ Both sides cite the rule of *Shelton v. American Motors Corp.,* 805 F.2d 1323, 1327 (8th Cir.1986). [7] The *Shelton* court held that depositions of opposing counsel should be limited to where the party seeking to take the deposition has shown that: (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case. [8] The court gave the following as reasons for its decision to restrict the circumstances under which opposing counsel may be deposed:

"Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony. Finally, the practice of deposing counsel detracts from the quality of client representation. Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent."

*Id.,* at 1327.

FED.R.CIV.P. § 26(c) provides that a court may make "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that the disclosure or discovery not be had." Rule 26(c) is broader in scope than the attorney work product rule, attorney-client privilege and other evidentiary privileges because it is designed to prevent discovery from causing annoyance, embarrassment, oppression, undue burden or expense not just to protect

5. Aplt.App. 1546.

6. Aplt.App. 1735.

7. The plaintiffs pointed out, however, that some district courts have held that the blanket protection is inappropriate and objections should be made to inappropriate questions, i.e., *qad., inc. v. ALN Associates, Inc.,* 132 F.R.D. 492 (N.D.Ill. 1990) which disagreed with the holding in *Shelton.* Our affirmation of the protective order in the case before us is based solely on the discretion of the trial judge under Rule 26(c) and, therefore, we need not distinguish or disapprove of lower court cases such as *qad v. ALN Associates, Inc.* at this time.

8. The opinion in *Shelton* indicates that all the information sought in that case was protected by the work product rule (a conclusion vigorously disputed in a dissenting opinion). Although apparently the majority in that case could have reached its decision on that ground alone it stated its holding more broadly in the three criteria set forth above. Although the dissenting opinion of District Judge Battey in *Shelton* would have permitted the questioning of opposing counsel even Judge Battey conceded that "discovery should be liberally permitted *subject to the control of the court to prevent abuse."* (emphasis added) *Id.,* at 1331. In the case before us the district court properly exercised its discretion to control discovery under Rule 26(c).

confidential communications. Accordingly, in the context of this case, the critical issue is not whether the plaintiffs sought privileged information or how such a privilege should be asserted, the question is whether the trial court abused its discretion in attempting to protect the defendants from an unnecessary burden. Viewed in this light we approve of the criteria set forth in *Shelton v. American Motors, supra,* but at this time we need only make the more limited holding that ordinarily the trial court at least has the *discretion* under Rule 26(c) to issue a protective order against the deposition of opposing counsel when any one or more of the three *Shelton* criteria for deposition listed above are *not* met.[9]

9. *Shelton* presented to the Eighth Circuit the question whether to reverse sanctions imposed against a party's in-house counsel for failure to answer questions. In the case before us we need not reach the issue whether a protective order or other denial of discovery in such a case is mandatory, but merely affirm the trial judge's decision to issue a protective order preventing the questioning of a party's counsel as being *at least* a reasonable exercise of discretion under Rule 26(c) regardless of whether for other reasons or on other legal grounds the order might have been permissible or even required by law. We do not decide those issues at this time although it is obvious that the *Shelton* requirement that the information sought be nonprivileged is mandatory, not discretionary, in nature.

In holding that the trial judge generally at least has discretion to issue such a protective order when the *Shelton* criteria are met we also need not and do not, by implication, exclude the possibility that a trial judge would have discretion to issue such a protective order in other appropriate situations where the criteria are not met.

10. The protective order was granted by Magistrate Hilbert Schauer at a hearing on July 30, 1990. The magistrate found that the plaintiffs had not shown that the information they sought could not be obtained elsewhere, mentioning two past officers of the corporation as possible alternative sources. By her Minute Order dated August 24, 1990 Judge Weinscheink denied the plaintiffs' motion for reconsideration with leave to the plaintiffs to move for reconsideration again if further discovery revealed that the information sought was not available from other sources.

One of the past officers mentioned by Magistrate Schauer was David P. Marcott, who was present at the public meeting where plaintiffs suspect that McGrath may have intentionally made false statements. In denying the plaintiffs' motion for leave to take McGrath's deposition by Order dated March 30, 1992, Chief Magistrate Judge Abram, after noting several avenues of

The defendants have argued that the *Shelton* criteria were not met in this case because the plaintiffs failed to seek the information they desired from other sources. The plaintiffs argue in response that they should not be required to question many witnesses who may not possess the necessary information and that, in any event, no one other than the lawyer himself can explain what he meant by what he said.

 The record indicates, however, that the plaintiffs did not even fully explore those matters upon which they wished to inquire of defendant's counsel with the witnesses they did depose.[10] It is certainly not too much to

inquiry by deposition not yet pursued by the plaintiffs, pointed out that in their deposition of Mr. Marcott the plaintiffs did not attempt to refresh Mr. Marcott's recollection of statements made by Edward McGrath at a public meeting when Marcott said he did not specifically remember those statements. The magistrate judge found that the plaintiffs had failed to show a "substantial effort" to obtain the information sought from other sources and this finding appears reasonable on the record before us.

On page 28 of their opening brief plaintiffs cite a couple of points in the transcript of Mr. Marcott where he did not remember a specific statement of McGrath or could not comment on the state of mind of McGrath regarding an issue faced by Cotter, but not in reference to any inquiry about a particular statement made by McGrath. These citations do not contradict the findings of the chief magistrate judge. Although in an earlier statement not referenced by the plaintiffs Marcott said that he had no recollection of any statements McGrath made at the public hearing the transcript also shows, as the chief magistrate judge pointed out, that Marcott could recall some discussions with McGrath when his memory was refreshed.

The plaintiffs gave no citation for their assertion that George Rifakes (also present at the public meeting) was also unable to testify as to the matters for which they sought to question McGrath. The two transcripts of the depositions of Rifakes total to well over 350 pages. The burden is on the plaintiffs to establish that the *Shelton* criteria are met and we need not search the record to substantiate plaintiffs' claim. *Gilbert v. Shalala,* 45 F.3d 1391, 1395 (10th Cir. 1995), *Sil–Flo, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1513 (10th Cir.1990). *See also U.S. v. Voigt,* 877 F.2d 1465, 1470 (10th Cir.), *cert. denied,* 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989) (not the task of the court to search the record for error where a party cites to the court "approximately 400 pages of transcript and identifies no particular instance.")

expect the plaintiffs to make a reasonable effort to seek information from the sources they chose to pursue. The only information for which Mr. McGrath was likely to be the exclusive source is McGrath's own reasons for making certain statements as a spokesperson for Cotter. Nevertheless, even this is not clear because it is possible that the testimony of some of the officers and directors regarding statements McGrath made to them in private might have a bearing on McGrath's state of mind and be admissible evidence under the state of mind or admissions exceptions to the rule against hearsay.[11] In any event, the plaintiffs have not established that inquiry into these matters was crucial to their case.

■ The plaintiffs argue that McGrath's testimony was essential to their claims for punitive damages. Even assuming that proof of a fraud by McGrath acting as an agent is relevant to punitive damages claims against the principal corporation in what the plaintiffs have characterized as a nuisance/trespass case, in order to demonstrate that McGrath's state of mind was crucial to their case the plaintiffs would first have to establish as many other elements of the fraud as possible, including the nature of the statements made, through alternative sources. The failure of the plaintiffs to make a substantial effort to establish as many elements of the alleged wrongs as was possible

through alternative sources before seeking the testimony of defendants' counsel not only undermines the argument that all the information sought from him was exclusively within his possession, it also undermines the argument that the particular information (if there was any) *that was* exclusively within his possession would be proof of a crucial link or corroborative of a weak link in a chain of proven elements to establish punitive damages. Inquiry could at least have been directed to the officers and directors first; knowledge or fraudulent intent on their part would be more directly probative of the corporation's liability for punitive damages and during their questioning they could also have been asked about any nonprivileged statements McGrath may have made regarding his intentions and knowledge. Only after such questioning would the district court have been fully able to assess whether McGrath's deposition was crucial to their case. Accordingly, we affirm the decision to grant the protective order.[12]

## III. EXCLUSION OF EVIDENCE OF FEAR OF CANCER AND DISEASE

■ The plaintiffs appeal from the decision of the trial court to exclude evidence of the plaintiffs' fears of cancer or other disease as annoyance and discomfort damages under nuisance and trespass theories of recovery.

---

11. Fed.R.Evid. 801 & 803(3).

12. Although the plaintiffs only challenge the protective order restricting the deposition of McGrath in their statement of issues, in their brief they also mention and criticize the trial court's refusal to allow the plaintiffs to put McGrath on the witness stand at trial to identify an exhibit.

Rule 26(c), upon which we premise our decision, applies by its terms only to discovery, however, "[i]t is axiomatic that the trial court also has considerable discretion in determining how a trial is to be conducted." *Blair v. Eagle–Picher Industries, Inc.,* 962 F.2d 1492, 1500 (10th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 464, 121 L.Ed.2d 372 (1992); *Palmer v. Krueger,* 897 F.2d 1529, 1538 (10th Cir.1990); *Thweatt v. Ontko,* 814 F.2d 1466, 1470 (10th Cir.1987) where the court said "the direction of the trial court will not be disturbed absent a manifest injustice to the parties." This discretion has been held to extend to limiting the number of expert witnesses. *Chapman v. United States,* 169 F.2d 641,

642–43 (10th Cir.1948), *cert. denied,* 335 U.S. 860, 69 S.Ct. 134, 93 L.Ed. 406 (1948); *Blair, supra.* It would be an anomalous holding to say that the trial court was within its discretion in preventing the deposition of opposing counsel and on the other hand to hold that the trial court exceeded its discretion in protecting opposing counsel from being called as a witness at trial. Accordingly, we hold that where the *Shelton* criteria are not all met during trial it will ordinarily be permissible to protect opposing counsel from being compelled to testify at trial as well.

The plaintiffs contend that McGrath's testimony was essential for the identification and admission of a relevant and important exhibit, a conference report on a waste disposal study. The plaintiffs, however, fail to explain the importance of this exhibit to their case or to show any prejudice resulting from the trial court's decision. Accordingly, we conclude that the *Shelton* criteria were neither met before trial nor at the trial.

The trial judge found such evidence irrelevant. The standard for review of evidentiary rulings is for abuse of discretion, as set forth in *McEwen v. City of Norman, Oklahoma*, 926 F.2d 1539, 1553 (10th Cir.1991), quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n. 2 (10th Cir.1986): "Under the abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."

▮ In the case before us, however, the plaintiffs allege that the trial court based its decision on a clear error regarding Colorado law that was crucial to the court's assessment of relevance of the excluded evidence. While a ruling on the relevance of the evidence is reviewed for abuse of discretion, *McEwen v. City of Norman, Oklahoma, supra,* whether damages are allowed for fear of cancer or other disease as "annoyance and discomfort" in a nuisance or trespass case is a question of law that we review *de novo*.

▮ Damage issues in tort claims arising under state law are determined by the applicable state law. *Union Oil Co. of California v. Heinsohn*, 43 F.3d 500, 506 (10th Cir.1994). In this case Colorado law applies. Colorado allows damages for annoyance and discomfort in cases of injury to real property. *Weld County Board of County Commissioners v. Slovek*, 723 P.2d 1309, 1318 (Colo.1986). The lower court, however, held that "annoyance and discomfort" did not include unfounded fears of cancer or other disease.

▮ The plaintiffs argue that even though their emotional distress claims were dismissed they should be permitted to introduce evidence of fear of cancer and other disease because there is a distinction between proof of liability on an emotional distress claim through evidence of fear of disease (which the lower court did not permit in a decision that the plaintiffs have not challenged on appeal) and proof of damages in a nuisance case through evidence of fear of disease (which the plaintiffs argue is permissible). Ironically, although the plaintiffs argue that the lower court confused proof of liability and proof of damages, the plaintiffs, in support of their position cite RESTATEMENT OF THE LAW, TORTS 2D § 821F comment f, a comment dealing not with damages but rather with proof of liability in a nuisance case. That passage reads as follows:

"*f. Normal mental reactions.* In determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, even though they may be without scientific foundation or other support in fact. Thus the presence of a leprosy san[i]tarium in the vicinity of a group of private residences may seriously interfere with the use and enjoyment of land because of the normal fear that it creates of possible contagion, even though leprosy is in fact so rarely transmitted through normal contacts that there is no practical possibility of communication of the disease." [13]

13. We decide this case based on the failure of the plaintiffs to demonstrate that fear of contracting a disease is a form of compensable "annoyance or discomfort" under Colorado law, regardless of whether Colorado follows comment f of the Restatement § 821F. Therefore, it is not necessary for us to decide whether Colorado would in fact follow that particular Restatement comment. We note, however, that even if comment f were on point it is not clear that Colorado would follow it.

Although the Colorado Supreme Court has cited the Restatements in this kind of case, it has not followed the Restatements slavishly (see *Weld County Board v. Slovek*, 723 P.2d 1309, 1318 (Colo.1986) questioning the Restatements rule that a nonoccupant-owner cannot recover annoyance and discomfort damages) and we are not convinced that it would follow this particular comment from two decades ago, allowing compensation for wholly unfounded fears. The Supreme Court of Michigan, which decided a case allowing a nuisance claim based on unfounded fears of a "pesthouse", or hospital for contagious diseases, many years ago (*Birchard v. Lansing Board of Health*, 204 Mich. 284, 169 N.W. 901, 4 A.L.R. 590 (1918)) recently decided not to allow a claim of nuisance based on the depreciation in real property values caused by unfounded fears of third party potential buyers of the real property due to publicity about nearby contamination. *Adkins v. Thomas Solvent Company*, 440 Mich. 293, 487 N.W.2d 715 (1992).

The Supreme Court of Michigan was careful to point out that the plaintiffs in that case had *not* made claims based on their *own* fears, but rather based on the effect on property values of the

We are apparently being urged to draw an inference that if fear of disease can prove an element of a nuisance case then fear of disease must also be compensable as an item of "annoyance and discomfort" damages in a nuisance or trespass case. This is not clear, however, from the cited authorities. We must bear in mind that nuisance (and trespass) is, at bottom, a claim for injury to property, not to the person. It is possible that while fear of disease might prove an element of a nuisance claim by showing how the utility or desirability of a property had been affected, that the fears would, nevertheless, not be relevant in measuring the damages. For example, a court could hold that such fears were not within the definitions of "annoyance and discomfort" even though taking them into account on the issue of liability to determine whether to issue an injunction or to award damages for the loss of value to the property (measured without direct evidence of the fears that caused the loss of value).

Although the Restatement is quite clear that unfounded fears of disease can be taken into account in determining liability in a nuisance case the comment dealing with annoyance and discomfort damages has no similar language. RESTATEMENT OF THE LAW, TORTS 2D § 929, comment e. Further, two of the cases cited by the plaintiffs, *Park v. Stolzheise*, 24 Wash.2d 781, 167 P.2d 412 (1946) and *Armory Park v. Episcopal Community Services*, 148 Ariz. 1, 712 P.2d 914 (1985), both granted injunctive relief and neither held that fears of disease could constitute annoyance and discomfort damages.

The plaintiffs also cite *Bolin v. Cessna Aircraft Co.*, 759 F.Supp. 692 (D.Kan.1991) where the court, applying Kansas law, allowed damages for annoyance and discomfort without physical injury in a case of groundwater contamination. However, there is no dispute that annoyance and discomfort damages are available in such a case. The issue at hand is whether *unfounded fears* of disease are a form of recoverable annoyance and discomfort damages. The *Bolin* case did not address that issue [14] and the lower court in the case before us gave precisely that reason for distinguishing the *Bolin* case.[15] The issue of fears of future harm was addressed by the same court, however, in *Maddy v. Vulcan Materials Co.*, 737 F.Supp. 1528, 1537–38 (D.Kan.1990) where the court (also applying Kansas law) held that unfounded fears are not compensable:

> "The plaintiffs' alleged emotional distress, which primarily takes the form of a 'fear of the future,' arises as an indirect response to the exposure to chemicals allegedly emitted by Vulcan. *The plaintiffs*, however, *have not* provided proof of exposure to harmful levels of toxic chemicals produced by Vulcan, nor have they *demonstrated that their emotional fears and concerns on the subject are reasonable reactions to the alleged exposure and that those fears are based on objectively verifiable and reliable medical information related to that exposure.*"

(emphasis added)

Clearly the District Court of Kansas, in applying Kansas law, has rejected the plain-

---

fears of third parties. Nevertheless, the form of the court's argument calls into question whether a court might continue to follow the Restatements rule, let alone adopt it, today. The court said:

> "[W]e would think it ... *anachronistic* that a claim of nuisance in fact could be based on unfounded fears regarding persons with AIDS moving into a neighborhood, the establishment of otherwise lawful group homes for the disabled, or unrelated persons living together, merely because the fears experienced by third parties would cause a decline in property values."

*Adkins*, supra 487 N.W.2d at 726 (emphasis added, footnotes omitted).

The Michigan court cited the case of *Nicholson v. Connecticut Half–Way House, Inc.*, 153 Conn. 507, 218 A.2d 383 (1966) where the court denied an injunction against a half way house for selected parolees even though the plaintiffs alleged *their own* fears that the residents of the half way house would commit criminal acts in the neighborhood. The court there, like the court below in the case before us, required some evidence to substantiate the fears.

14. *Bolin* did say that compensation for the endangerment of health and peace of mind were allowable but did not say that damages could be awarded for unfounded fears.

15. Normal annoyance and discomfort would include the psychic harm caused by past or present odors or noises—actual annoyances not fears of possible future harms. Our opinion on fears of future harms does not apply to these other normal annoyances and discomforts.

tiffs' contention that unfounded fears of the future can constitute annoyance and discomfort damages and the plaintiffs have presented no convincing contrary authority in any other jurisdiction.[16]

The ultimate question before us is one of Colorado law, not Kansas law. However, our examination of Colorado cases, while hardly conclusive on this point[17], suggests to us that the Colorado Supreme Court, if confronted with this question, would reach much the same conclusion as the *Maddy* court.

In *Slovek v. Board of County Commissioners*, 697 P.2d 781 (Colo.App.1984), a trespass and negligence case where the plaintiffs' property was flooded, the court did not allow damages for emotional distress but did allow damages for unspecified annoyance and discomfort (to be determined after remand). On appeal at 723 P.2d 1309 (Colo.1986) the Colorado Supreme Court was not confronted with the issue of emotional distress[18] and affirmed on the issue of annoyance and discomfort without discussing whether that term encompassed unfounded fears of disease or anything else. However, the court did make clear that any claim for annoyance and discomfort must be based upon "reasonable and competent evidence". In the case before us the lower court, citing *Slovek* as authority, would not allow the introduction of evidence of fears of cancer or other disease "unless they're grounded by some more substantial evidence than just someone saying they're afraid." This interpretation, while not clearly required by the Colorado Su-

preme Court's holdings appears to us the correct conclusion to draw from the opinion in *Slovek*.

The trial court also cited *Towns v. Anderson*, 195 Colo. 517, 579 P.2d 1163 (1978). In *Towns* Colorado held that "naked claims of emotional distress" can be made only where the emotional distress results in physical manifestations or mental illness. *Id.*, at 1164–5. The plaintiffs argue that applying the *Towns* rule is an error of law here because this is a trespass and nuisance case, not a naked claim of emotional distress. Of course, for that reason, *Towns* is not on point, however, in view of the lack of authority directly on point from the Colorado Supreme Court the rationale of the *Towns* case should surely be taken into account. In *Towns* the court, even while perhaps liberalizing the rule for emotional distress, noted the policies of guarding against speculative and fraudulent claims. The only reason given for not requiring a physical impact as a prerequisite for damages was the court's belief that "the medical profession has made tremendous advances in diagnosing and evaluating emotional and mental injuries." In our judgment the potential for fraudulent or speculative claims that concerns the Colorado Supreme Court could only be effectively limited in a nuisance or trespass case such as this by a rule requiring evidence substantiating that the fears of disease, resulting from the contamination of land, are reasonable and have a sound foundation in medical, scientific or statistical evidence.[19]

16. The plaintiffs point out that Lauri Maddy was never told by any medical person that her respiratory conditions were caused by exposure to toxic chemicals and that there is no discussion in the opinion of any evidence that such an exposure was likely to cause medical problems. Nevertheless, *Maddy* did hold that *unfounded* fears were not compensable, contrary to plaintiff's argument based on the Restatements. Whether the fears of the plaintiffs in the case before us were well founded is a question we will address later in this opinion.

17. During oral argument Judge Henry advised counsel for the plaintiffs that he had examined their authorities and that in his judgment they would not prevail before this court on this particular issue. He then inquired whether the plaintiffs would prefer to have the issue certified to the Colorado Supreme Court if the alternative

were to lose on the issue. The plaintiffs' counsel then said that she believed the issue could still be certified but that she preferred that this court decide the issue to avoid delaying the resolution of the case.

18. The Colorado Supreme Court denied certiorari on the emotional distress claim. *Slovek*, 723 P.2d at 1313 n. 4. However, the denial of the emotional distress claim might simply be a statement about the appropriate legal theory on which to establish liability; it is not necessarily a statement that similar harms cannot be compensated under a trespass or nuisance theory.

19. Such a requirement is similar to the *Towns* requirement that an act must be negligent because of its tendency to cause harm through some manner other than by fright, shock or the internal operations of an emotional disturbance.

In the case before us the trial court did not find that the fears of the plaintiffs were grounded by substantial evidence and it held that such a foundation was a prerequisite to the admissibility of the evidence. We hold that the trial court's interpretation of the law was not in error on this point and that based on the record before the court the decision to exclude evidence of fears of cancer or other disease was not an abuse of discretion.[20]

## IV. PIERCING THE CORPORATE VEIL

The plaintiffs contend that Commonwealth Edison, the sole stockholder of Cotter, should not be protected from liability by the fact that Cotter operated in the corporate form. The plaintiffs argue that Cotter is a mere instrumentality of Commonwealth Edison and that failure to pierce the corporate veil would result in a grave injustice because Commonwealth Edison bought Cotter to benefit the residents of Illinois, and Colorado residents, who live with the contamination caused by Cotter's new mill, will be unable to obtain compensation from Commonwealth Edison.

In this case, alleging torts under Colorado law, the question of piercing the corporate veil must be determined by Colorado law as well. *Lowell Staats Mining Co. v. Pioneer*

*Towns,* supra at 1165. In view of our holding that there was not sufficient substantiation of the risk of cancer or other disease on the record in this case we need not reach the question whether the requirement of a proven mental illness (or manifestations of physical illness resulting from emotional distress) is also required to show annoyance and discomfort in a case of injury to real property.

20. The plaintiffs state in their reply brief that Dr. Joseph Q. Jarvis "reported that lung cancer was 29% higher than expected at the 95% confidence level for the years 1979–90." Aplt.Reply Brief 19, citing Aplee.Supp.App. 2001. This statement is false. What Dr. Jarvis said at the cited page is: "Lung cancer observed cases were 29% greater than expected for men and women combined, two cases *short of a statistically significant elevation* at the p=.05 level." (emphasis added)

The referenced Tables 1, 2 and 3 all confirm this statement. Eight kinds of cancer were studied and the notes to all three tables clearly state: "Observed/Expected ratios that have a 95% Confidence Interval that brackets the value 1.00 are not considered statistically high or low." *Id.,* at 2008–12. In every table for every kind of cancer for which there were observed cases the confidence interval included the value of 1.00; none of the observed levels of cancer were elevated to a statistically significant level.

The referenced report also says that "[f]ewer cases of all cancers combined are observed compared to expected." *Id.* at 2001. The report did find that residents, especially men, might be at moderately increased risk for lung cancer, but "the risk estimate is imprecise." *Id.,* at 2002. The Jarvis report also states: "The finding of a modest increase in risk for lung cancer in Lincoln Park, even with imprecise estimates of the risk, begs the question whether exposure to mill-derived radioactive substances may be a cause of neoplasia in this community." *Id.,* at 2003. After noting possible causes the report continues: "However, Figures 1 and 2 do not demonstrate either an unusual age distribution of lung cancer cases or a clustering of time diagnosis, both of which might be expected with an outbreak of lung cancer due to a point source environmental exposure." *Id.,* at 2004.

Even if the elevated levels of lung cancer for men had been statistically significant a court might well take account of the statistical "Texas Sharpshooter" fallacy in which a person shoots bullets at the side of a barn, then, after the fact, finds a cluster of holes and draws a circle around it to show how accurate his aim was. With eight kinds of cancer for each sex there would be sixteen potential categories here around which to "draw a circle" to show a statistically significant level of cancer. With independent variables one would expect one statistically significant reading in every twenty categories at a 95% confidence level purely by random chance. Therefore, a court might reasonably look for some medical or other scientific evidence that the alleged exposure would be expected to cause lung cancer in men to be affected differently than other forms of cancer and lung cancer in women before concluding that higher rates for just this one form of cancer in this one segment of the population were anything more than a coincidence.

The plaintiffs did not argue that any other evidence of the likelihood of future cancer was introduced and given their statement that contamination has occurred for 30 years the absence of evidence of a past or present health effect is especially conspicuous.

The plaintiffs do argue that the area in which they live has been placed on the National Priorities List of the Environmental Protection Agency (EPA) and that this is evidence of the hazard to them. However, proof of damage to the environment is not equivalent to proof of danger to humans. The plaintiffs failed to show that the EPA status of their area demonstrates a human health hazard.

**836**

*Uravan, Inc.,* 878 F.2d 1259, 1262 (10th Cir. 1989).[21]

■ The lower court granted summary judgment for the defendant Commonwealth Edison. A motion for summary judgment is reviewed *de novo. Bacchus Industries v. Arvin Industries,* 939 F.2d 887, 891 (10th Cir.1991). The court must view the evidence in the light most favorable to the party opposing the motion. *Osgood v. State Farm,* 848 F.2d 141, 143 (10th Cir.1988).[22]

"[C]orporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities." *Cascade Energy and Metals Corp. v. Banks,* 896 F.2d 1557, 1576 (10th Cir.1990), *cert. denied,* 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990) (applying Utah law); *Skidmore v. Canada Life,* 907 F.2d 1026 (10th Cir.1990) (Colorado law). In order to hold Commonwealth Edison liable the plaintiffs must prove that the corporate entity "was used to defeat public convenience, or to justify or protect wrong, fraud or crime." *Lowell Staats Mining Co. v. Pioneer Uravan, Inc.,* 878 F.2d 1259, 1265 (10th Cir.1989). The possibility that the plaintiffs may have difficulty enforcing a judgment against Cotter alone is not the type of injustice that warrants piercing the corporate veil. *Id.*

Whether a subsidiary is an instrumentality is determined by reference to the following criteria:

"(1) The parent corporation owns all or majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed."

*Fish v. East,* 114 F.2d 177, 191 (10th Cir. 1940).

The lower court held that Cotter was not an instrumentality of Commonwealth Edison because Cotter was adequately capitalized, had repaid loans from Commonwealth Edison regularly and had scrupulously observed all the legal requirements of a corporation. The plaintiffs do not dispute that the corporate formalities were observed but do dispute that loans were repaid regularly and that Cotter was adequately capitalized.

■ The plaintiffs contend that Cotter's repayment of its indebtedness was illusory

**21.** Plaintiffs also argued that Commonwealth Edison should be held liable as an owner operator under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* The argument for piercing the corporate veil under federal law (or simply for liability of Commonwealth Edison under the federal statute), citing cases that are several years old, was raised for the first time in the plaintiffs' reply brief on appeal with no citation of any record reference showing that this issue had been raised below. Accordingly, we will decide this question solely under Colorado law. *See Palmer v. Reconstruction Finance Corporation,* 164 F.2d 466, 468 (2d Cir.1947), *cert. denied,* 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948) (where Judge Learned Hand stated that the rule against reversing upon a ground not raised below has greater force where the issue is raised for the first time in a reply brief).

**22.** Although we have said that the decision whether or not to pierce the corporate veil is primarily a factual one it is also clear that a verdict as a matter of law may be justified where the facts, viewed most favorably to the party seeking to pierce the veil, do not justify such a result. *Lowell Staats Mining Co. v. Pioneer Uravan, Inc.,* 878 F.2d 1259, 1262 & 1263–4 (10th Cir.1989).

because of a "sham stock transaction made for the sole purpose of bolstering Cotter's balance sheet while preserving Commonwealth's right to receive payment on the funds advanced (now in the form of preferred stock dividends rather than interest)." The plaintiffs argue that if the preferred stock were properly recharacterized as debt it could be seen that Cotter is undercapitalized.

The plaintiffs' argument, however, ignores that preferred stock is not debt and that the claims of creditors, including any successful plaintiffs, will have priority over the claims of preferred stockholders for the return of their capital. The purchase of preferred stock by a sole stockholder is not, as the plaintiffs contend, "like a consumer buying a sofa for cash and then going back and giving the store more money years after the purchase;" rather it is like a consumer buying a sofa for cash and then going back and paying the store more money years after the purchase to have the sofa reupholstered. The purchase of preferred stock, whether for cash or in exchange for the discharge of indebtedness, adds value to the company and leaves it better able to meet its obligations to all its creditors.

■ The plaintiffs also contend that the balance sheet for Cotter overstates its current assets because inventories cannot be considered current assets. The plaintiffs argue that the mill has not been operating for years and, therefore, amounts listed as inventories cannot be expected to be consumed within one year, which is necessary, by definition, for them to be current assets. The plaintiffs offer no authority regarding the standard accounting practice for characterization of inventories under these circumstances, but rather stand solely on their semantic argument. In any event, however, we find that their argument misses the point. Regardless of how these assets should be treated on the balance sheet the mere fact that a business becomes "undercapitalized" solely because of the recharacterization of assets when it ceases to operate does not prove that the business was set up in a manner so that it would be undercapitalized, nor does it show that the corporation "was used to defeat public convenience, or to justify or protect wrong, fraud or crime." We hold that the *Fish v. East* criteria must be examined in light of the principles and policies underlying the doctrine of piercing the corporate veil and in light of those policies the plaintiffs' argument that Cotter is (or was) undercapitalized is unavailing.

The plaintiffs cite *Friedman & Son, Inc. v. Safeway Stores*, 712 P.2d 1128 (Colo.App. 1985) as authority that the corporate veil may be pierced where the first, second and seventh *Fish* criteria are met. While it is true that the opinion is *Safeway* relies on these three criteria and it is also true that on the record before us under the summary judgment standard these three criteria are satisfied, *Safeway* is distinguishable on its facts because the subsidiary in that case was not only owned by the parent but was also *incorporated as a wholly owned subsidiary* to operate a baling system to prepare the parent's waste cardboard for recycling (*Fish* criterion number four). In the case before us the subsidiary, Cotter Corporation, existed as an independent corporation for years before it was purchased by Commonwealth Edison.[23]

**23.** The case of *Shamrock Oil and Gas Co. v. Etheridge*, 159 F.Supp. 693 (D.Colo.1958), cited by the plaintiffs, is distinguishable on similar grounds in that the corporation in that case was held to be an alter ego *of one of its incorporators* where the corporation's sole function was to hold naked legal title to a drilling rig. Similarly, *Milgo v. United Business Communications*, 623 F.2d 645 (10th Cir.1980), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980), also cited by the plaintiffs, is distinguishable because there both the parent corporation and the alter ego were organized as wholly owned subsidiaries of the same third corporation. *Id.*, at 658–9. In *Garden City Co. v. Burden*, 186 F.2d 651 (10th Cir.1951) the complaint alleged that a company "was *organized* and ... maintained and operated for the sole purpose of carrying out the aims and purposes of the parent." (emphasis added) *Id.*, at 652. Although the opinion does not indicate if this allegation was proven the case is distinguishable in that the subsidiary did not maintain its formal separateness, had no telephone listing or offices in its own name and owned no equipment with which to operate.

The plaintiffs argue that under the various agreements between Commonwealth Edison and Cotter that Commonwealth completely controlled Cotter. In fact, those agreements do give Commonwealth Edison significant control over the general policies and plans of Cotter. The May 14, 1975 Operating Agreement, for example, requires approval from Commonwealth Edison before Cotter makes any material change in its mine development plan, in the design or construction of the mine and processing plant, in the mining, concentrating or refining processes employed and before Cotter embarked on any of a variety of programs of exploration, mining or processing. However, the Operating Agreement also specifically states: "Day-to-day mine operations, so long as consistent with the 'long range mine development plan', shall not be deemed to be a part thereof but shall be the sole responsibility of Cotter." Aplt. App. 960.

To summarize, reading the record in the light most favorable to the plaintiffs for purposes of this decision, it appears to us that of the criteria in the *Fish v. East* case the third (parent financing) and ninth (taking direction from parent) are somewhat qualifiedly present here. The sixth (that the parent pays salaries, expenses or losses of the subsidiary) appears partly present in the sense that the parent was required to reimburse Cotter for expenses incurred in mining operations for its benefit but there is nothing to suggest that the formal separateness of the corporations was disregarded. Two entirely independent corporations could have an arrangement for reimbursement of expenses such as that agreed to here without becoming one corporation.

The first (parent ownership), second (interlocking boards), seventh (substantially no business except with the parent) and eighth (subsidiary is referred to as such in papers of parent) criteria of the *Fish* case are present here as well. However, the fourth (parent organizes or subscribes to all of subsidiary's stock), fifth (grossly inadequate capital) and tenth (lack of formalities) criteria are not satisfied.

In applying the ten criteria in a case such as this we do not determine the winner by a numerical score, as in a ball game. We must view all the factors and even if a majority favor the party seeking to pierce the corporate veil that party does not necessarily prevail if the criteria—when taken as a whole with due regard to the extent to which they were and were not fully satisfied—do not demonstrate that the corporate form "was used to defeat public convenience, or to justify or protect wrong, fraud or crime." In the case before us we hold as a matter of law, that on the record before us piercing the corporate veil was not warranted.

## V. CONCLUSION

We have reviewed all four issues presented to us on this appeal and we find no error.

Affirmed.